AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | )   Case No. |
| Apple iPhone Model #A1688 with IMEI | ) |
| 355768075242183 (Target Telephone-1) | ) |

FILED

JAN 2 5 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

**19MJ0328**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-1.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841, 846, 843 | Distribution of a Controlled Substance, Possession to of a Controlled Substance with Intent to Distribute, and Conspiracy to do the same; Illegal Use of a Communication Facility; |

The application is based on these facts:

See attached affidavit of Michael J. Rod.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael J. Rod, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/25/19

_____
*Judge's signature*

City and state:  San Diego, California

Hon. William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1

### CELLULAR PHONE TO BE SEARCHED

Apple iPhone Model #A1688 with IMEI 355768075242183 (**Target Telephone-1**).

**Target Telephone-1** is currently being held as evidence in the Southern District of California.

## **ATTACHMENT B**
## **ITEMS TO BE SEIZED**

Authorization to search the cellular phones described in Attachments A-1 through A-11 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones. The seizure and search of the cellular telephones shall be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, for the period of **January 1, 2018** to and including **the date the cellular phone was seized by law enforcement**:

a. tending to identify efforts to obtain, possess, or distribute methamphetamine, heroin, or some other controlled substances;

b. tending to identity accounts, facilities, storage devices, and/or services-such as email addresses, IP addresses, and phone numbers-used to facilitate the smuggling and distribution of methamphetamine, heroin, or some other controlled substance;

c. tending to identify co-conspirators, criminal associates, or others involved in smuggling and distribution of methamphetamine, heroin, or some other controlled substance;

d. tending to identify travel to or presence at locations involved in the smuggling and distribution of methamphetamine or some other controlled substance, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the subject telephones; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 841, 846, and 843.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## ATTACHMENT A-1

## CELLULAR PHONE TO BE SEARCHED

Apple iPhone Model #A1688 with IMEI 355768075242183 (**Target Telephone-1**).

**Target Telephone-1** is currently being held as evidence in the Southern District of California.

## ATTACHMENT B
## ITEMS TO BE SEIZED

Authorization to search the cellular phones described in Attachments A-1 through A-11 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones. The seizure and search of the cellular telephones shall be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, for the period of **January 1, 2018** to and including **the date the cellular phone was seized by law enforcement**:

a. tending to identify efforts to obtain, possess, or distribute methamphetamine, heroin, or some other controlled substances;

b. tending to identity accounts, facilities, storage devices, and/or services-such as email addresses, IP addresses, and phone numbers-used to facilitate the smuggling and distribution of methamphetamine, heroin, or some other controlled substance;

c. tending to identify co-conspirators, criminal associates, or others involved in smuggling and distribution of methamphetamine, heroin, or some other controlled substance;

d. tending to identify travel to or presence at locations involved in the smuggling and distribution of methamphetamine or some other controlled substance, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the subject telephones; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 841, 846, and 843.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Michael J. Rod, being duly sworn, declare and state:

PURPOSE OF AFFIDAVIT

1.     This affidavit supports applications for warrants to search the following cellular phones:

  a.     Apple iPhone Model #A1688 with IMEI 355768075242183 (**Target Telephone-1**);

  b.     LG Model #LM-X210MA with IMEI 352342093679256 (**Target Telephone-2**);

  c.     Alcatel Model #5027B with MEID 35790707676594 (**Target Telephone-3**);

  d.     Samsung Galaxy S9+ with IMEI 353522095508087 (**Target Telephone-4**);

  e.     LG Model #LG-K330 with IMEI 352569082128925 (**Target Telephone-5**);

  f.     Samsung Model SM-J727A with IMEI 355617051933717 (**Target Telephone-6**);

  g.     LG Model LGMS210 with IMEI 357588082801526 (**Target Telephone-7**);

  h.     Coolpad (phone) with IMEI 864377030271016 (**Target Telephone-8**);

  i.     Samsung Model SM-J327P with DEC 089869568808668181 (**Target Telephone-9**);

  j.     Samsung Model SM-S727VL with IMEI 354727081124281 (**Target Telephone-10**);

  k.     Samsung Model SM-J737 with IMEI 356058090314111 (**Target Telephone-11**);

(collectively, **Target Telephones**), as described in Attachments A-1 through A-11.

2.     Based on the information below, there is probable cause to believe evidence of crimes in violation of Title 21, United States Code, Sections 841, 846, and 843 (Distribution of Controlled Substances, Possession of Controlled Substances for Distribution, Conspiracy to Distribute Controlled Substances, and Illegal Use of a Communication Facility), as described in Attachment B will be found in the **Target Telephones**.

3.     As outlined below, the **Target Telephones** were seized during the course of a Title III investigation and all **Target Telephones** are being held as evidence in the Southern District of California.

4.     Except as otherwise noted, information set forth in this affidavit has either been observed or provided to me by task force officers from the North County Regional Gang Task Force (NCRGTF) or other multi-agency federal, state, and local drug/gang task force officers with whom I have spoken, whom were involved in this investigation, or whose reports I have read and reviewed. In this affidavit, I have also included, where appropriate, my interpretation of quoted and/or coded language in parenthesis and/or brackets. Those interpretations are based upon my training and experience, conversations I have had with other law enforcement officers familiar with this investigation, as well as my personal participation in this investigation.

5.     Because this affidavit is being submitted for the limited purpose of seeking the search warrants specified above, I have not set forth each and every fact learned during the course of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrant.

## TRAINING AND EXPERTISE

6.     I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

7. I am a Special Agent of the Federal Bureau of Investigation (FBI), and have been so employed since May 2010. I am currently assigned to the San Diego Field Division, North County Resident Agency. Prior to joining the FBI, I was a United States Marine Corps Judge Advocate serving on active duty from November 2001 until May 2010. In my capacity as a Judge Advocate, I prosecuted and defended violations of the Uniform Code of Military Justice, acted as the Investigating Officer during criminal proceedings, provided legal assistance to service members, and advised military commanders on a wide variety of civil and administrative matters.

8. I have received twenty-one (21) weeks of training at the FBI Academy in Quantico, Virginia. During that training, I received instruction regarding a wide variety of investigative techniques that are commonly used in support of a wide range of the FBI's investigative priorities. The training included instruction regarding the use of sources, electronic surveillance techniques, law enforcement tactics, search and seizure laws and techniques, surveillance, forensic techniques, interviewing, and a variety of other subjects. I have acted as the lead investigator on a variety of cases and have participated in multiple cases that have focused on gang related matters.

9. Since July 2012, I have been assigned to the NCRGTF. The San Diego County Sheriff's Department has appointed me an Associate Agent assigned to the Sheriff's Department Special Investigation Division and specifically assigned to the NCRGTF. During my time at the NCRGTF, I have had personal contact with dozens of self-admitted or known gang members and their associates and have discussed their lifestyles, method of operations regarding violent and property crimes, and their drug trafficking and drug distributing activities. I have participated in investigations involving criminal gang members including but not limited to Hispanic criminal street gangs and have performed various investigative tasks involving the following:

    a. Functioning as a surveillance agent and thereby observing and recording movements of gang members trafficking in illegal drugs and weapons, and

those suspected of committing violent crimes and trafficking in illegal drugs and weapons;

b.   Tracing monies and assets gained by drug traffickers from the sale of illegal sale of drugs and weapons (laundering of monetary instruments);

c.   Interviewing dozens of witnesses, cooperating individuals, and confidential informants relative to gang activities including: violent acts, illegal trafficking of drugs and the distribution of monies and assets derived from illegal trafficking of drugs;

d.   Monitoring and reviewing thousands of recorded jail calls as well as recorded telephone calls pursuant to Title III court orders in narcotics and gang-related cases as well as handled Confidential Human Sources with access to drug dealers, firearms dealers, gang members and the Mexican Mafia hierarchy; and

e.   Supervising, as a case agent/co-case agent, specific investigations involving criminal gangs, trafficking of drugs, weapons and the laundering of monetary instruments.

10.   In my training and experience, I have learned that individuals engaged in narcotic trafficking often use their cell phones and electronic media to conspire, plan and coordinate their criminal activities and that cellphones and electronic media retain evidence of their crimes such as communications, photographs, videos, contact information of co-conspirators, location data, travel arrangements, and financial data that evidence criminal activities.

FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

**Background**

11.   Starting in December 2017, the FBI and San Diego County Sheriff's Department (SDSD) began investigating methamphetamine distribution by multiple

1   individuals in the San Diego area. Investigators identified Mark Warner[1] (WARNER) as

2   an individual selling methamphetamine in the San Diego area. Between February and June

3   of 2018, WARNER sold methamphetamine to a Confidential Source (CS-1[2]) during

4   multiple controlled purchases that were audio and video recorded and surveilled by

5   investigators. WARNER introduced CS-1 to Akila Bihl[3] (BIHL), who has also sold

6   methamphetamine to CS-1, facilitated by WARNER, which investigators seized, weighed,

7   and field tested.

8       12.    This investigation has included the use of district judge authorized Title III

9   intercepts, including cellular telephones used by both WARNER and BIHL. The

10

11

_____

12   [1]    On November 16, 2018, the Honorable William V. Gallo issued a federal arrest
13   warrant 18MJ5910 for WARNER for violations of 18 U.S.C. section 922(g)(1) and Title 21
     U.S.C. sections 841(a)(1).  WARNER was arrested on January 20, 2019.

14

15   [2]    CS-1's criminal history includes the following convictions: 1997 misdemeanor
     conviction for PC 242/243 (Battery); 2001 misdemeanor conviction for H&S 11550(a)
16   (Under the Influence of a controlled substance); 2003 misdemeanor conviction for H&S
17   11550(a) (Under the influence of a controlled substance); 2006 felony conviction for H&S
     11378 (Possess controlled substance for sale); 2006 felony conviction for H&S 11378
18   (Possess controlled substance for sale); 2006 felony conviction for PC 487(a) (Grand
19   Theft); 2010 felony convictions for H&S 11379 (Transport controlled substance for sale)
     and PC 459 (Burglary); 2012 felony conviction for H&S 11377(a) (Possess controlled
20   substance); 2013 misdemeanor conviction for PC 148(a) (Obstruct public officer); 2014
21   felony convictions for PC 459 (Burglary) and HS11360 (Transport marijuana for sale); and
     2015 PC 3056 Parole Violation. In November 2017, CS-1 was arrested for a federal drug
22   trafficking crime and subsequently plead guilty to that crime. CS-1 agreed to assist law
23   enforcement in hopes of receiving a recommendation by the Government for a lower
     sentence. On November 13, 2018, CS-1 received a time served sentence. CS-1 has
24   consistently provided information that has proven credible and reliable. As of June 19,
25   2018, CS-1 has been paid approximately $14,200 for expenses and $9,921 for services.

26   [3]    On November 16, 2018, the Honorable William V. Gallo issued a federal arrest
27   warrant 18MJ5909 for BIHL for violations of 18 U.S.C. section 922(g)(1) and 21 U.S.C.
     section 841(a)(1). BIHL was arrested on November 29, 2018.

28
                                         5

1  investigation to date indicates that BIHL and his girlfriend Raphaela Moore[4] (MOORE)

2  maintained multiple sources of supply for methamphetamine to include Caroly Saunders[5]

3  (SAUNDERS) and Vicente Lopez Palomares[6] (LOPEZ). Further, BIHL facilitates

4  narcotics transactions for others, including, but not limited to, Steven Moncrief[7]

5  (MONCRIEF), Brad Harville[8] (HARVILLE), Donald Burns (BURNS), and Lirazel Ford

6  (FORD). Likewise, the investigation to date indicates that WARNER maintains multiple

7  sources of supply for methamphetamine, including BIHL and Kia King (KING).

8  WARNER also facilitates narcotics transactions for others, including Kaherine Hildebrand

9  (HILDEBRAND), Theodore Rybczk (RYBCZK), Eric New (NEW), and others.

10      13.    During the course of this investigation, law enforcement has conducted

11  multiple state and federal search warrants at locations associated with targets of this

12  investigation. Additionally, investigators requested law enforcement to conduct

13  investigative traffic stops of several of the targets of this investigation. The investigative

14  traffic stops and search warrants have resulted in multiple seizures of large quantities of

---

16  [4]    On November 16, 2018, the Honorable William V. Gallo issued a federal arrest
17  warrant 18MJ5909 for MOORE for violations of 21 U.S.C. section 841(a)(1). MOORE
18  self-surrendered to law enforcement on January 3, 2019.

19  [5]    On November 16, 2018, the Honorable William V. Gallo issued a federal arrest
20  warrant 18MJ5908 for SAUNDERS for violations of 21 U.S.C. sections 841(a)(1) and 846.
   On November 29, 2019, SAUNDERS was contacted and served a Notice to Appear.

21  [6]    On November 08, 2018, the Honorable Robert A. McQuaid issued a federal arrest
22  warrant 18MJ5779 for LOPEZ for violations of 21 U.S.C. section 841(a)(1). LOPEZ was
23  arrested on November 15, 2018.

24  [7]    On November 16, 2018, the Honorable William V. Gallo issued a federal arrest
25  warrant 18MJ5907 for MONCRIEF for violations of 21 U.S.C. sections 841(a)(1) and 846.
26  MONCRIEF was arrested on November 29, 2018.

27  [8]    On November 08, 2018, the Honorable Robert A. McQuaid issued a federal arrest
28  warrant 18MJ5780 for HARVILLE for violations of 21 U.S.C. section 841(a)(1).
   HARVILLE is currently on state custody on unrelated charges.

1  methamphetamine from targets of this investigation. Based on the content of the
2  intercepted calls outlined in this affidavit, the controlled purchases conducted by CS-1 with
3  WARNER and BIHL, and the seizures outlined below, I believe that the conversations
4  outlined below are regarding narcotics transactions. Further, there is probable cause to
5  believe evidence of crimes in violation of Title 21, United States Code, Sections 841, 846,
6  952, 960 and 843 (Distribution of Controlled Substances, Conspiracy to Distribute
7  Controlled Substances, Importation of a Controlled Substance, Illegal Use of a
8  Communication Facility), as described in Attachments B will be found in the **Target**
9  **Telephones.**

10  <u>**Target Telephones-1, -2, and -3**</u>

11  14.  During the course of this investigation, HARVILLE has been intercepted
12  coordinating large narcotics transactions with BIHL. Additionally, HARVILLE, and his
13  girlfriend, Rachel McNeil (MCNEIL) have been observed at BIHL's residence for the
14  purpose of completing the narcotics transactions.  For example, On July 14, 2018, in an
15  intercepted call to BIHL's monitored phone, HARVILLE explained to BIHL that his friend
16  "has a big wallet" and had one to two thousand dollars to spend. BIHL responded, "Oh, so
17  he wants to spend 19 [$1900]." HARVILLE responded, "Yeah, is that feasible?" BIHL
18  answered, "Yeah, right now but better hurry." Pole camera footage confirmed that
19  HARVILLE arrived at, and then departed from, BIHL's residence in a vehicle belonging
20  to MCNEIL.

21  15.  On the following day, on July 15, 2018, HARVILLE again called BIHL's
22  monitored phone and they agreed to meet later in the day "to do the other half." Later that
23  day,  surveillance  agents  observed  HARVILLE  and  MCNEIL  arrive  and  park
24  approximately one block from BIHL's residence and walk to BIHL's residence.  A short
25  time later, pole camera video and surveillance agents observed HARVILLE and MCNEIL
26  depart BIHL's residence and return to MCNEIL's vehicle. Surveillance agents observed
27  HARVILLE and MCNEIL depart the area in the vehicle with HARVILLE driving and
28  MCNEIL in the front passenger seat. A marked Sheriff's unit stopped the vehicle in the

1  area of Friars Road and Frazee Road at the request of investigators and for traffic violations.

2  HARVILLE was slow to yield and deputies observed a white crystalline substance being

3  thrown out of the passenger front window, where MCNEIL was sitting.

4      16.   Eventually HARVILLE stopped and deputies searched the vehicle. Deputies

5  found unidentified pills, illegal mushrooms, a baggie of methamphetamine, packages of

6  Suboxone, and a burnt piece of tin foil with black tar residue in the center console. Deputies

7  searched a backpack that was located on a backseat in the vehicle they believed belonged

8  to HARVILLE and found a scale with residue, numerous small baggies, a container with a

9  black tar substance, a ziplock bag with a white crystalline substance, and a glass

10  methamphetamine pipe. Deputies located and seized **Target Telephone-1**, **Target**

11  **Telephone-2**, and **Target Telephone-3**.

12      17.   Agents also recovered, what a DEA laboratory later confirmed to be, 77 grams

13  of methamphetamine (actual) off the ground and street near the area where deputies

14  witnessed the white crystalline substance being thrown from the window closest to

15  MCNEIL.

16      18.   A review of prior law enforcement contact for HARVILLE and MCNEIL

17  revealed that they were contacted together and arrested on September 28, 2017 after a

18  traffic stop of a vehicle HARVILLE was driving. MCNEIL was again the front seat

19  passenger. MCNEIL was arrested pursuant to an active arrest warrant and a search of her

20  person and purse revealed small amounts of methamphetamine and heroin, a roll of

21  baggies, various pills, and drug paraphernalia. A search of HARVILLE's person revealed

22  $106 in cash and unused baggies concealed in his underwear as well as a red digital scale

23  in the center console of the vehicle.

24      19.   Based on my training and experience, I know that it is common for narcotics

25  distributors to possess multiple cellular telephones in which they store content and make

26  calls related to narcotics distribution. Additionally, based on the intercepted calls between

27  HARVILLE and BIHL, the surveillance observations of both HARVILLE and MCNEIL

28  arriving at and departing BIHL's residence prior to the July 15, 2018 traffic stop; the

1   evidence items located during the traffic stop of HARVILLE and MCNEIL on July 15,
2   2018; and the prior law enforcement contact involving HARVILLE and MCNEIL, I
3   believe that evidence of crimes as described in Attachments B will be found on **Target**
4   **Telephone-1, Target Telephone-2,** and **Target Telephone-3.**

5   **Target Telephones-4 and -5**

6       20.    During the course of this investigation, LOPEZ has been intercepted
7   coordinating large narcotics transactions with BIHL. Additionally, LOPEZ, and his
8   girlfriend, Diana Guerrero (GUERRERO) have been observed at BIHL's residence for the
9   purpose of completing the narcotics transactions. For example, On July 2, 2018, at
10  approximately 6:10 p.m., BIHL received an incoming call on the monitored line from
11  LOPEZ. At the beginning of the call, LOPEZ told BIHL, "I have excellent news." BIHL
12  interjected, "Yeah?" and LOPEZ continued, "Hopefully I do, I think this is a winner....yeah,
13  so I'll be I'll be over there tonight around eightish nineish [to bring narcotics]." BIHL
14  clarified, "Over here [United States]?" and LOPEZ affirmed.  In that same call, BIHL then
15  asked, "Have you spoke to um, whatever his name is?" BIHL responded, "Yeah, he said
16  uh he just wants, wants money back I guess [money paid for narcotics]."  LOPEZ stated,
17  "Well, I haven't got money from him." BIHL responded "I thought that he paid all that off."
18  LOPEZ answered, "No, he never paid nothing off." BIHL then asked "...how much did he
19  owe?" and LOPEZ responded, "All five [pounds of narcotics] remember?"  BIHL
20  commented, "I don't remember that's why I was asking." LOPEZ then explained, "Yeah,
21  cause um, I left you twelve [twelve pounds of narcotics] remember?" BIHL interjected
22  "Right," and LOPEZ continued, "And you gave me from those twelve, two were yours, so
23  we're down, we're down to ten, and one of those ten, um, um, one was his, so that makes
24  us go down to nine, and then you gave me how many back, four?"  BIHL answered "yeah,
25  four from him, and I paid you for all mine." LOPEZ continued, "No, no yours is separate.
26  So, from nine we go down to five, which which five he hasn't paid." BIHL asked, "Really?"
27  LOPEZ answered, "Yeah, that's what I've been telling you, if he was gonna keep em, or he
28  was gonna buy em or what." BIHL reassured LOPEZ, "...OK, I'll get at him don't trip."

9

LOPEZ then told BIHL, "If he doesn't want em fuckin' um, send em back." Based on my training and experience and the investigation to date I believe that BIHL and LOPEZ are discussing narcotics related debt.

21.     On July 19, 2018, at approximately 4:21 p.m., LOPEZ placed a call to BIHL's monitored phone. At the beginning of the call, BIHL said, "What's up Chaco?" LOPEZ responded, "Nothing much, I'm over here in town [in the United States] seeing what's up with you." BIHL responded, "I'm doing alright can you come get your uh, stuff [money]." Later LOPEZ asked, "You don't need nothing [narcotics]?" and BIHL responded, "Maybe one or two." LOPEZ confirmed, "Two….Give me like an hour…how long you gonna be there?" BIHL responded, "I'ma be here for probably another 45 minutes." LOPEZ responded, "OK, I'll do it, I'll do it quick then."

22.     Later that day, on July 19, 2018, at approximately 5:03 p.m., a Toyota Tacoma pickup truck was observed by surveillance agents and captured on video by a pole camera overlooking BIHL's residence. GUERRERO exited the passenger side of the Toyota Tacoma and LOPEZ exited the driver's seat and they entered BIHL's residence. At approximately 5:12 p.m., LOPEZ and GUERRERO departed BIHL's residence in the Toyota Tacoma. At approximately 5:21 p.m., LOPEZ placed a call to BIHL and informed BIHL, "a hundred short." BIHL echoed, "a hundred short…I got you." Based on my training and experience, the intercepted calls, and observations of surveillance agents, I believe that LOPEZ and GUERRERO transported narcotics to BIHL's residence and picked up narcotics proceeds from BIHL at his residence.

23.     On July 26, 2018, at approximately 5:00 p.m., a marked Sherriff's unit stopped a black Dodge Caliber being driven by LOPEZ at the request of our investigation and for traffic violations. Deputies approached the vehicle and saw that there were two passengers, later identified as GUERRERO in the front seat and Sinay Lopez, LOPEZ' sister in the rear of the vehicle. When asked if he had anything illegal on him, LOPEZ said, "I'm going to be honest with you, I have meth in my pocket" and consented to a search of his person. LOPEZ had approximately 104 grams of methamphetamine in his left pocket

1  and said there was more in his girlfriend's purse. Deputies found approximately 230 grams
2  of methamphetamine in a freezer bag in GUERRERO's purse. The substance in the freezer
3  bag was analyzed by a DEA laboratory and found to be 217.4 grams of methamphetamine
4  (actual).

5      24.    A deputy asked GUERRERO about the methamphetamine and she told
6  investigators LOPEZ handed her the methamphetamine when they were being pulled over
7  and asked her to hide it. GUERRERO said they had crossed into the United States from
8  Mexico an hour before being stopped and LOPEZ had the freezer bag with him when they
9  entered the United States. Deputies asked LOPEZ about the methamphetamine and he told
10  investigators they crossed in from Mexico an hour earlier and an unknown Hispanic male
11  on the streets of San Ysidro had handed him the freezer bag. Sinay Lopez told deputies
12  they crossed in from Mexico and had driven straight to a self-storage facility, where
13  LOPEZ went to a storage locker.

14      25.    Investigators were already familiar with the self-storage facility and had
15  observed LOPEZ at the self-storage facility immediately prior to the traffic stop. LOPEZ
16  and GUERRERO were arrested and the methamphetamine and **Target Telephones-4** and
17  **-5** were seized as evidence. Deputies also seized a key for a storage locker from LOPEZ
18  upon his arrest.

19      26.    In a video-recorded post-arrest statement, LOPEZ admitted a storage locker
20  at the self-storage facility could have methamphetamine, a scale, and baggies but said they
21  were not his. LOPEZ said a man in Mexico had given him the storage key so he could store
22  items in the locker. In a video-recorded post-arrest statement, GUERRERO said she
23  wanted to correct her earlier statement and they had crossed from Mexico and stopped at a
24  storage facility where LOPEZ keeps tires to pick up a tire. GUERRERO said she also stores
25  items she sells at swap meets in the storage locker. GUERRERO said she did not know
26  whether there were more drugs in the storage unit. GUERRERO said she did not discuss
27  LOPEZ' business with him. GUERRERO also said she believed LOPEZ picked up the
28  freezer bag of narcotics from the storage locker.

27.     On July 26, 2018, investigators executed a search warrant at Import Storage, 1575 Howard Avenue, San Ysidro, California. The key from LOPEZ worked on storage locker B3-5. In the locker was drug-packaging material, two digital scales, approximately 10 ziplock bags containing a combined 12 pounds of methamphetamine and a bale of marijuana. The locker also contained one vehicle tire and a bag of old clothes.

28.     Based on the intercepted calls between LOPEZ and BIHL, the surveillance observations of both LOPEZ and GUERRERO arriving at and departing BIHL's residence to complete a narcotics transaction; and the evidence items located during the traffic stop of LOPEZ and GUERRERO on July 26, 2018, I believe that evidence of crimes as described in Attachments B will be found on **Target Telephones-4** and **-5**.

### **Target Telephone-6**

29.     During the course of the investigation, FORD has been intercepted coordinating ounce quantity methamphetamine transactions with BIHL. For example, on July 2, 2018, at approximately 11:17 p.m., FORD, using telephone number 619-288-5980, called BIHL on the monitored phone. During the call, FORD asked, "I was wondering if... somebody could come pick me up, I needed to come see you anyway, I have like, a little over five bills [$500]..." BIHL responded, "Nobody over here has a car... except me..." Ford replied, "Really?" and BIHL affirmed and continued, "It's been real slow because of the truck tires thing [bad quality methamphetamine]." FORD replied, "Yeah, it's all good" and asked, "You have it though?" BIHL affirmed. FORD continued, "The same person, it's for the same person, I guess they liked it... I told em' too... it might taste a little bit like burnt tires... but its good stuff..." FORD continued, "I need two [ounces of methamphetamine] for sure..." BIHL replied, "Yeah." FORD indicated that she was going to find an Uber for a ride. At approximately 11:52 p.m., FORD placed another call to BIHL on the monitored phone. During the call, FORD asked BIHL, "Hey, do you want anything from McDonalds?" BIHL told her that he wanted a chocolate shake. A few minutes later, at approximately 12:02 a.m., on July 3, 2018, surveillance agents observed FORD exit the

McDonalds in close proximity to BIHL's residence. A few minutes later, a pole camera overlooking BIHL's residence captured FORD arriving at BIHL's residence.

30.    FORD and BIHL coordinated additional narcotics transactions during the course of this investigation. On July 11th, 20th, and 29th, 2018, investigators intercepted calls regarding narcotics transactions between FORD and BIHL. On some of these occasions, FORD was also captured on pole camera video arriving at BIHL's residence.

31.    On August 30, 2018, investigators conducted a probation compliance search at FORD's residence. During the probation search, FORD identified **Target Telephone-6** as her phone number. Prior to departing the probation search, investigators called telephone number 619-288-5980 and observed **Target Telephone-6** ring, which was seized as evidence.

32.    Based on the intercepted calls between FORD and BIHL, the surveillance observations of FORD arriving at and departing BIHL's residence to complete a narcotics transaction; and the seizure of **Target Telephone-6** from FORD, I believe that evidence of crimes as described in Attachment B will be found **on Target Telephone-6**

### Target Telephone-7

33.    During the course of this investigation, BURNS has been intercepted using Target Telephone-7 coordinating narcotics transactions with BIHL. On most of the occasions, BURNS and BIHL did not discuss the price or amount of the particular narcotics transaction. However, on one occasion, on July 16, 2018, at approximately 11:32 a.m., BURNS called BIHL on the monitored line and attempted to provide a MacBook Pro to BIHL as collateral for "an ounce and a half." BIHL did not accept the offer and responded, "oh, hell no…" Later that day, at approximately 9:12 p.m., BURNS again called BIHL on the monitored line and BURNS informed BIHL that he had "cash" and BIHL indicated that he would travel to BURNS' location. Based on my training and experience and my knowledge of this case, I believe that BURNS picked up methamphetamine from BIHL that was intended to be redistributed to others.

34. On July 26, 2018, marked Sheriff Deputies conducted a traffic stop of BURNS at the request of investigators pending the execution of a state search warrant at BURNS' residence. BURNS was the sole occupant of the vehicle. During the traffic stop, the a deputy located two plastic baggies containing suspected methamphetamine on BURNS' person, which had an approximate gross weight of 12.9 grams and 4.7 grams. Additionally, the deputy located one plastic bag containing suspected methamphetamine in the visor of BURNS' vehicle, which had an approximate gross weight of 1.4 grams. The deputy also located and seized **Target Telephone-7** during the traffic stop. The suspected methamphetamine seized during the traffic stop was sent to the DEA lab for testing, which confirmed that the substance was methamphetamine with a combined weight of 19.1 grams (actual). Based on the quantity of methamphetamine seized from BURNS, his contact with BIHL, and the fact that BURNS was carrying methamphetamine in three separate packages with three different weights, I believe that BURNS possessed the methamphetamine with the intent to redistribute it.

35. Based on the intercepted calls between BURNS and BIHL, the evidence items located during the traffic stop of BURNS on July 26, 2018, and my training and experience, I believe that evidence of crimes as described in Attachments B will be found on **Target Telephone-7**.

### Target Telephone-8

36. During the course of this investigation WARNER sourced methamphetamine from multiples sources of supply, including KING. As outlined below, WARNER and KING coordinated large narcotics transactions during the course of this investigation. For example, on June 29, 2018, at approximately 1:45 p.m., WARNER's associate, Eric New (NEW) used WARNER's monitored phone to contact KING, using cellular telephone number 619-453-3737. During the call, KING asked, "Where are you going to be at?" NEW responded, "I'm at my buddy Mark's [WARNER] right now, he [WARNER] wanted me to call you and see what's crackin'." KING responded, "I'm out [of narcotics] for a minute." NEW asked, "Today sometime?" and KING responded, "yeah, hopefully." NEW

asked, "What's the best... you can give me for a half L [half pound of methamphetamine]?" KING replied, "A whole one [pound of methamphetamine], eighteen [$1,800]." NEW responded, "Right when you do this... call Gabby's [NEW's girlfriend] phone for me."

37. On June 29, 2018, at approximately 10:54 p.m., NEW called WARNER's monitored phone. Investigator's recognized NEW's voice from the 1:45 p.m. call as well as subsequent monitored calls between WARNER and NEW. During the call, WARNER asked, "What are you doing?" and NEW responded, "Waiting for her." WARNER asked, "Waiting for who?" and NEW responded, "Waiting for Kia [KING]." WARNER asked, "Did she call you?" NEW responded, "She texted me... she's taking care of it right now." WARNER replied, "Handle that shit." NEW asked, "What are you doin? Where are you at?" and WARNER replied, "Waiting... at my house right now."

38. On July 5, 2018, at approximately 8:53 p.m., KING placed an outgoing call to WARNER. During the call, KING stated, "I have a little under a half [half pound of narcotics] so do you want just a quarter?...I'm gonna go get more right now." WARNER replied, "I'll take whatever you can get me." KING then said, "OK. Perfect." WARNER replied, "I'll be here." At approximately 9:23 p.m., WARNER placed another outgoing call to KING. At the beginning of the call, WARNER said "Hey Kia" and KING immediately responded, "I'm almost there." WARNER responded, "OK, you are coming here then?" KING affirmed and indicated that she was almost there.

39. Based on the above monitored calls and my training and experience, I believe that WARNER requested NEW to contact KING in order to obtain a pound of methamphetamine. Further, I also believe that several days later on July 5th, KING resupplied WARNER with an unknown quantity of narcotics and was in possession of at a little less than a half pound of narcotics meant for redistribution.

40. On July 19, 2018, a marked Sheriff's Deputy conducted a traffic stop of a vehicle driven by KING at the request of investigators and for traffic violations. KING was the sole occupant of the vehicle at the time of the traffic stop. A narcotics trained K-9 conducted a search of the vehicle and alerted on a black bag inside the vehicle. A search

15

1 | of the black bag revealed a working digital scale with methamphetamine residue and
2 | multiple empty ziplocked bags commonly used to package narcotics. The marked Sheriff's
3 | Deputy also located two cellular telephones. During the traffic stop, investigators called
4 | the phone number intercepted by law enforcement during the he course of the investigation
5 | and confirmed that one of the cellular telephones found during the traffic stop rang. For
6 | investigative reasons, the phone intercepted by law enforcement [619-453-3737][9] was left
7 | in KING's possession and **Target Telephone-8** was seized.

8   41.   Based on my training and experience and my knowledge of this case, I believe
9 | that it is common for narcotics distributors to regularly use multiple cellular telephones to
10 | conduct narcotics related business and that narcotics traffickers frequently change cellular
11 | telephones. Accordingly, based on the intercepted calls between NEW and KING and
12 | WARNER and KING, the evidence items located during the traffic stop of KING on July
13 | 19, 2018, and my training and experience, I believe that evidence of crimes as described in
14 | Attachments B will be found on **Target Telephone-8**.

15 | **Target Telephone-9**

16   42.   During the course of this investigation, RYBCZYK has been intercepted
17 | coordinating narcotics transactions with WARNER on multiple occasions. Additionally,
18 | as outlined below, intercepted conversations between RYBCZYK's associates, Iesha
19 | Galvan (GALVAN) and WARNER, confirmed prior narcotics transactions with
20 | RYBCYZK. For example, on June 28, 2018, at approximately 6:54 p.m., GALVAN sent
21 | a text message to WARNER's monitored phone: "Hey call me im in the rental bout to go
22 | sell a half to theo [RYBZCYK]." At approximately 6:56 p.m., WARNER, using the
23 | monitored phone, made a call to GALVAN. During the intercepted call, WARNER asked,
24 | "You still have that what you said real good?" GALVAN responded "Yeah… I got it, I got
25 | it with me, um...and I'm gonna go sell a half [half ounce] to fucking uh Theo

26

27   [9]   Investigators were tracking the location of telephone number 619-453-3737
pursuant to federal tracking warrant 18MC1020, which was signed by the Honorable
28 | Nita Stormes on July 17, 2018.

[RYBZCYK]…"Yeah, right now… I guess he got money… So, you should go, go and get yours, you know." WARNER responded, "Yeah, where? At the Welcome Inn?" GALVAN replied, "Yeah, if you want I can pick you up in the rental, it's a nice car." WARNER replied, "I don't go to the Welcome Inn, that place is hot as fuck down there." GALVAN responded, "Yeah… I'm just gonna go and sell it to him [RYBZCYK] or do you want me to bring him or what?" WARNER indicated that he might also know somebody staying at the Welcome Inn. GALVAN asked, "Hey, um, so do you wanna um when do you want to meet up?" WARNER replied, "Um, soon. I want to check out that shit [methamphetamine] you got. See if it's any good." GALVAN replied, "Yeah, I got two. I got two ounces on me right now." WARNER stated, "If it's good, I'll buy at least one [ounce of methamphetamine]." GALVAN and WARNER discussed meet locations and agreed to meet on the corner of Landis Street and Texas Street in San Diego.

43.     Surveillance agents were posted in the area of Landis Street and Texas Street and observed WARNER standing at the driver's side window of GALVAN's vehicle. GALVAN then departed the area. Based on above intercepted call and the observations of the surveillance agents, I believe that GALVAN drove to meet WARNER in order to complete the narcotics transaction discussed during the above intercepted call.

44.     Surveillance agents also posted at the Welcome Inn located at 1550 Washington Street, San Diego, California. Surveillance agents observed RYBZCYK walk out of the Welcome Inn and enter GALVAN's vehicle and depart the area. Based on above intercepted call and the observations of the surveillance agents, I believed that GALVAN picked up RYBZCYK in order to complete the narcotics transaction discussed during the above intercepted call.

45.     On multiple occasions during the course of the investigation, RYBZCYK was intercepted discussing narcotics transactions directly with WARNER. For example, on July 3, 2018, at approximately 7:02 p.m., RYBZCYK contacted WARNER on the monitored phone. During the intercepted call, RYBCYZK stated, "I need a whole one [ounce of methamphetamine]… I got someone [unknown customer] coming to get one… can I owe

17

you something on it?" RYBCYZK continued, "That's what he's coming for specifically... I charge him [unknown customer] two-fifty [$250 for an ounce of methamphetamine]." WARNER replied, "For sure... you owe me a hundred bucks on it tonight." RYBCYZK countered, "How about seventy five [$75]" and WARNER replied, "A full one is two hundred bucks... I'll give you a half ounce." Ultimately, WARNER and RYBCYZK agreed that RYBCYZK would owe WARNER a total of eighty dollars for the ounce of methamphetamine, which indicated that RYBCYZK paid WARNER $120 upon receipt of the narcotics.]

46. On July 10, 2018, investigators executed a federal search warrant at GALVAN's residence. RYBCYZK arrived at GALVAN's residence as investigators were executing the search warrant and both GALVAN and RYBCYZK were detained. During the search warrant, investigators located a small amount of methamphetamine on GALVAN's person, a digital scale in her purse, and drug packaging material in GALVAN's residence. Additionally, investigators seized **Target Telephone-9** from RYBCYZK.

47. Based on the intercepted calls between GALVAN and WARNER and RYBZYK and WARNER, observations of the surveillance agents on June 28, 2018, RYBZYK's presence at GALVAN's residence on July 10, 2018, and the items located at GALVAN's residence, as well as my training and experience, I believe that evidence of crimes as described in Attachments B will be found on **Target Telephone-9**.

### Target Telephone-10

48. During the course of this investigation, HILDEBRAND has been intercepted coordinating narcotics transactions with WARNER on multiple occasions. Specifically, on numerous occasions, HILDEBRAND attempted to trade stolen goods for methamphetamine to be redistributed for money. For example, on July 3, 2018, at approximately 9:01 a.m., HILDEBRAND called WARNER on the monitored line. During the intercepted call, WARNER asked, "What do you want?" and HILDEBRAND responded, "I don't know yet." WARNER stated, "You better make up your mind, there's

not much [methamphetamine] left." HILDEBRAND responded, "Well, I need some [methamphetamine] so I can make fucking money off of it." HILDEBRAND continued to be indecisive on the amount of narcotics she wanted from WARNER and WARNER asked, "If I tell you a pound [of methamphetamine]… do you want it?" HILDEBRAND declined and replied, "Just one [ounce of methamphetamine]." HILDEBRAND informed WARNER that she intended to pay for the narcotics with gift cards.

49.    On July 13, 2018, WARNER and HILDEBRAND again negotiated a narcotics transaction over WARNER's monitored line. At approximately 9:57 p.m., HILDEBRAND called WARNER's monitored line. During the intercepted call, WARNER asked, "What are you looking for?" HILDEBRAND replied, "Look, I know I'm not responsible all the time but I need two [ounces of methamphetamine] and they are gone tonight… like really they are already sold." HILDEBRAND continued, "For fucking quarters [quarter ounce of methamphetamine]… he [unknown narcotics sub-distributor]… fucking charges em one hundred and twenty dollars." WARNER replied, "Yeah, that's not bad… for a quarter O [quarter ounce of methamphetamine]." WARNER and HILDEBRAND agreed to meet later that day to complete the transaction.

50.    HILDEBRAND and WARNER were intercepted on July 22nd and 23rd, 2018 discussing stolen items and narcotics transactions. On July 24, 2018, a marked Sheriff Deputy conducted a traffic stop of HILDEBRAND. During the traffic stop, HILDEBRAND admitted to having drug paraphernalia in the vehicle. During a search of HILDEBRAND's vehicle, the deputy located multiple stolen items in HILDEBRAND's vehicle as well as **Target Telephone-10**, which was seized as evidence. HILDEBRAND identified the telephone number of **Target Telephone-10** as 619-937-1023, which is the same phone number intercepted during the course of this investigation. Some of the stolen items located in HILDEBRAND's vehicle were discussed during intercepted calls between HILDEBRAND and WARNER and WARNER and others.

51.    Based on the intercepted calls between HILDEBRAND and WARNER, the items located in HILDEBRAND's vehicle on July 24, 2018, as well as my training and

19

1 experience, I believe that evidence of crimes as described in Attachments B will be found
2 on **Target Telephone-10.**

3 **Target Telephone-11**

4 52.     During the course of this investigation, as described above, NEW was
5 intercepted on WARNER's phone coordinating a narcotics transaction between WARNER
6 and KING. Additionally, as further described below, NEW was intercepted coordinating
7 narcotics transactions directly with WARNER. NEW has multiple prior drug related
8 arrests, including a 2004 arrest for transportation and sales of illegal narcotics. As outlined
9 below, based on the content of the intercepted conversations between NEW and
10 WARNER, I believe that NEW was obtaining illegal narcotics from WARNER and others
11 for redistribution.

12 53.     For example, on July 3, 2018, at approximately 8:02 p.m., NEW contacted
13 WARNER on the monitored line. During the intercepted call, NEW and WARNER briefly
14 discussed WARNER meeting KING for narcotics. NEW then requested heroin from
15 WARNER to sell to an unknown customer. Specifically, NEW stated, "I need to meet you
16 right now… I need you to bring me a quarter piece [quarter ounce] of that [heroin]."
17 WARNER asked NEW how much he wanted and NEW responded, "Like five grams… of
18 the black [heroin]." WARNER and NEW negotiated a price and NEW stated, "I'm selling
19 half of what I just asked you for [five grams of heroin] for three hundred bucks." As another
20 example, on July 9, 2018, at approximately 8:24 p.m., NEW contacted WARNER on the
21 monitored phone. During the intercepted call, NEW asked WARNER, "You got any shit
22 [methamphetamine]?" and WARNER responded, "Very little." NEW asked, "How much
23 is a little?" WARNER replied, "Maybe a half [half ounce of methamphetamine]." 
24 WARNER indicated that he was waiting for KING to be resupplied and NEW responded,
25 "So am I." NEW asked, "Can I get the fourteen [fourteen grams of methamphetamine] at
26 your price?" WARNER agreed to sell the half ounce to NEW for eighty dollars but
27 indicated that he typically charged one hundred dollars for that amount.

28

54. On September 19, 2018, NEW was contacted during a traffic stop and arrested on pending state felony arrest warrants. A San Diego Sheriff's Detective downloaded **Target Telephone-11** pursuant to a valid 4th waiver terms of NEW's probation. This is an independent application to search **Target Telephone-11** and the FBI requests the Court not to consider any evidence that may have been found be the detective.

55. Based upon my training and experience, NEW's prior arrest history, the intercepted calls between WARNER and NEW during the course of this investigation, and the considerable evidence establishing WARNER as a distributor of narcotics, to include multiple controlled sales to CS-1, I believe that evidence of crimes as described in Attachments B will be found on **Target Telephone-11.**

### CELL PHONE SEARCH METHODOLOGY

56. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially

relevant data stored that is not subject to such acquisition, the examiner must examine the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

57.     Following the issuance of this warrant, FBI will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards, call detail records, and deleted files will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

58.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

59.     Based on the foregoing, I believe there is probable cause to believe items that constitute evidence of violations of federal criminal law, namely, of Title 21, United States Code, Sections 841, 846, and 843, as described in **Attachment B**, will be found in the property to be searched, as provided in **Attachments A-1** through **A-11**.

_____
Michael J. Rod
FBI Special Agent

SUBSCRIBED and SWORN to before me
this _25_ day of January, 2019

_____
HON. WILLIAM V. GALLO
United States Magistrate Judge

22